**ARKANSAS MEDICAL SOCIETY, INC., et al., Plaintiffs,**

**v.**

**Jack REYNOLDS, Director, Department of Human Services, State of Arkansas, Defendant.**

**No. LR–C–92–429.**

United States District Court, E.D. Arkansas, W.D.

Aug. 18, 1992.

Michael W. Mitchell, David L. Ivers, Mitchell, Blackstock, Simmons & Barnes, Little Rock, AR, for plaintiffs.

Debby Thetford Nye, Dept. of Human Services, Office of Chief Counsel, Little Rock, AR, for defendant.

William A. Dombi, Washington, DC, for amicus.

## MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

To balance Arkansas' Medicaid budget in fiscal year 1993, the Arkansas Department of Human Services reduced reimbursement rates to various Medicaid providers by 20%, effective July 1, 1992. The plaintiffs, who include both Medicaid providers and recipients, filed suit under 42 U.S.C. § 1983 claiming this reduction violates federal Medicaid laws under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* Following a hearing on July 20, 1992, this Court issued a verbal order enjoining the defendant from implementing the 20% reduction in reimbursement rates with respect to obstetrical and pediatric care, and in speech, physical, and occupational therapy for children pending a trial on the merits. The matter is now before the Court on motion of defendant for reconsideration.

### I. JURISDICTION

As a preliminary matter, the Court rejects defendant's jurisdictional challenge. Defendant argues this Court lacks jurisdiction because this action is not one based upon the only acknowledged private right of action, the Boren Amendment,[1] but rather is one based upon the equal access provision, 42 U.S.C. § 1396a(a)(30)(A) (Supp.1992). Defendant cites *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), for the proposition that Congress did not unambiguously create a private right of action under the equal access provision. The Court has carefully considered *Suter* and

does not find it to be dispositive of jurisdiction in this case. The Court in *Suter* merely held that § 671(a)(15) of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679, neither confers an enforceable private right on its beneficiaries nor creates an implied cause of action on their behalf. Here, the Court is dealing with the Medicaid laws under Title XIX of the Social Security Act. The Supreme Court has specifically held that " 'suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating states' " *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (quoting *Edelman v. Jordan,* 415 U.S. 651, 674, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974)). Likewise, in *Nebraska Health Care Assn. v. Dunning,* 778 F.2d 1291, 1295 (8th Cir.1985), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987), the Eighth Circuit Court of Appeals found that "[t]he Social Security Act, *including* the Boren Amendment, is a 'law' within the meaning of 42 U.S.C. § 1983, which creates a right of action for people who, under color of any state law, are deprived of a right secured 'by the Constitution *and laws* ' of the United States." (First emphasis added.) No cases are cited to this Court which foreclose a private right of action under 42 U.S.C. § 1396a(a)(30)(A), and, indeed, other courts have entertained § 1983 actions based upon the Medicaid provisions at issue in this case. *See e.g., Clark v. Kizer,* 758 F.Supp. 572 (E.D.Cal.1990) (addressing plaintiffs' claim that Medicaid recipients have been denied equal access to dental care), and *King By King v. Sullivan,* 776 F.Supp. 645 (D.R.I.1991) (addressing plaintiffs' claim that the defendants failed to make Medical Assistance payments that are sufficient to enlist new providers so that covered services are as available to recipients as to the general population).

### II. STANDING

The Court rejects as well defendant's claim that plaintiffs lack standing. It is well

1. 42 U.S.C. § 1396a(a)(13)(A). In *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 524, 110 S.Ct. 2510, 2525, 110 L.Ed.2d 455 (1990), the Supreme Court held that "[t]he Boren Amendment to the Medicaid Act creates a right, enforceable

in a private cause of action pursuant to § 1983, to have the State adopt rates that it finds are reasonable and adequate rates to meet the costs of an efficient and economical health care provider."

established that Medicaid *providers* (Doctors Maris, Finan, and Stizes) and Medicaid *recipients* (Ms. Henry and Ms. Parker) have standing to bring this lawsuit. *See e.g., Wilder v. Virginia Hosp. Ass'n, supra,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (health care providers can utilize 42 U.S.C. § 1983 to enforce both procedural and substantive requirements of 42 U.S.C. § 1396a(a)(13)(A)); *AMISUB (PSL) v. Colorado Dep't of Social Services,* 879 F.2d 789, 794 (10th Cir.1989) (Medicaid recipients and providers have standing to challenge state Medicaid plan based on their " 'parallel interests with respect to Medicaid funding and reimbursement' ") (quoting *Colorado Health Care Ass'n v. Colorado Dep't of Social Services,* 842 F.2d 1158, 1164 n. 5 (10th Cir.1988)), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); *Hodgson v. Board of County Commissioners,* 614 F.2d 601, 606 n. 7 (8th Cir.1980) (citing with approval district court case upholding standing of Medicaid patients, physicians, and medical clinics); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare,* 602 F.2d 150, 152 n. 6 (8th Cir.1979) (Medicaid providers have standing to challenge alleged violations of Social Security laws); *Thomas v. Johnston,* 557 F.Supp. 879, 902–904 (W.D.Tex.1983) (citing cases from several circuits for both recipients and providers).

■ The more difficult question is whether the medical *associations* have standing to sue. There are three requirements for associational or representational standing set forth in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). An association has standing to sue on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests the association seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Here, the plaintiff associations clearly meet the first and second prerequisites for associational standing. What remains to be determined is whether the claim asserted and the relief requested requires the participation of individual members in the lawsuit.

The plaintiffs complain that reimbursement rates set by the defendant for fiscal year 1993 violate the equal access provision of the Medicaid laws. Specifically, plaintiffs argue the reimbursement rates are not "consistent with efficiency, economy, and quality of care" and that such payments are not "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). Plaintiffs ask that the defendant be enjoined from implementing the new reimbursement rates.

■ Two major factors used by the Secretary of Health and Human Services and the courts in determining compliance with the equal access provision are (1) the level of physician participation in the program, and (2) the level of reimbursement to participating physicians. *Clark v. Kizer, supra,* 758 F.Supp. at 576. Other factors include (1) Are providers widely opting out of the program or restricting their Medicaid caseloads? (2) Is there a steady stream of reports that recipients are having difficulty obtaining care? and (3) the utilization rate. *Id.* at 577–78.

The Court has considered each of these factors and finds neither the equal access claim nor the request for injunctive relief requires the participation of individual members in the lawsuit and that both are properly resolved in a group context.[2] *Hunt,* 432 U.S. at 345, 97 S.Ct. at 2442. This simply is not a case where it will be necessary to

---

2. The Court notes that "the doctrine of associational standing recognizes that the primary reason people join in an organization is often to create an effective vehicle for vindicating interests that they share with others. The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all.' " *Automobile Workers v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986) (quoting *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624, 656, 95 L.Ed. 817 (1951) (Jackson, J., concurring)).

examine evidence particular to individual providers in order to determine compliance with the equal access provision. *Cf. Kansas Health Care v. Kansas DSRS*, 958 F.2d 1018, 1022 (10th Cir.1992) (evidence particular to individual providers necessary in order to determine compliance with the Boren Amendment). Indeed, the court in *Clark* considered for purposes of determining compliance with the equal access provision the *participation ratio* of physicians participating in the program, the *average* or *usual* rates and the reimbursement provided by private insurers, the *percentage* of providers participating in the program who dropped out, *declarations* from recipients who indicated they could not find treatment, and the *percentage* of utilization. *Id.* 758 F.Supp. at 576–78. Such information, most of which is statistical in nature, can be provided by the plaintiff associations and does not require the individual participation of each Medicaid provider.

Nor does the relief requested require the participation of individual members. Plaintiffs are not seeking damages on behalf of the individual members but are seeking prospective relief in the form of an injunction. As stated in *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975), "[i]f in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." The Court finds plaintiffs have standing to bring this lawsuit.

## III. *PRELIMINARY INJUNCTION*

The Court now turns to the principal issue before the Court—whether plaintiffs have set forth circumstances warranting injunctive relief. The standards for granting preliminary relief as set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc), involve consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. These factors are to be balanced to determine whether relief should be granted and no single factor is determinative. *Id.*

### A.

■ At the July 20th hearing, evidence was presented to this Court which raises serious questions concerning the effect the 20% cut in the reimbursement rate will have on the availability of medical care in the area of obstetrics and pediatrics, and in speech, physical, and occupational therapy for children. Dr. Maris testified with respect to family practice that he is likely to close his clinic in Newton County, and that he is at least considering cutting back on the Medicaid patients he sees in Harrison and Lead Hill. Dr. Finan testified that his clinic, the Central Arkansas Clinic of Obstetrics & Gynecology, took 85% percent of Garland County's obstetrical cases, and that he is not going to take any new Medicaid OB patients. He states that "[t]he reduction of provider reimbursement rates has forced us to cease rendering prenatal care to Medicaid recipients, leaving hundreds of pregnant women to find the care elsewhere." Plaintiffs' exhibit 21. Dr. Powell of the same clinic states the reductions will result in an increased neonatal, perinatal, and obstetrical morbidity and mortality. *Id.* Clearly, if Doctors Finan and Powell are no longer seeing OB patients and their clinic took 85% percent of Garland County's obstetrical cases, there can be no doubt of the threat of irreparable harm to the OB Medicaid patients in Garland County.

The same is true of patients in Craighead County. Nancy Chrisman, administrator of the Northeast Arkansas Women's Clinic, testified that her clinic in Jonesboro, which has four practicing obstetricians, is no longer taking Medicaid patients. She states that her clinic delivered 540 Medicaid patients in 1991, and that as of June 29, 1992, it has accepted 336 *new* Medicaid OB patients which forecasts a year-end total of approximately 700. She states, however, that instead of continuing the present volume and

receiving less income, her clinic, effective July 1, 1992, will cease taking any new Medicaid patients based on reimbursement for prenatal care and delivery of Medicaid obstetric patients. Plaintiffs' exhibits 8 and 21.

The Court additionally finds a threat of irreparable harm in the area of speech, physical, and occupational therapy for children. Ben Lovelace–Chandler, who runs the Kids' Speech Physical Occupational Therapy facility (Kids' Spot) in Little Rock, testified that he is no longer accepting new Medicaid patients and will terminate those he has at the end of July, 1992. He states as follows:

> Current reductions in the Medicaid reimbursement rates for therapy being implemented by Mr. Whitlock will hinder the providing of therapy services to the Medicaid patients. The reductions will leave the reimbursement rates below the level in place two years ago ... Current reimbursement rates do not allow competitive salaries.
>
> \*   \*   \*   \*   \*   \*
>
> Regretfully, this facility cannot accept new Medicaid patients at this time. I anticipate the need to discontinue services to approximately 50 current patients by July 31, 1992, unless the June 1992 reimbursement rates can be restored ... I contacted other therapists to consider possible alternatives and learned that several had already discontinued services to Medicaid patients ... I realize many [o]f the neediest families and children will have access to fewer and fewer services, and as stated previously, the result is regretful.

Plaintiffs' Exhibit 6. There in no evidence before the Court to suggest that these patients had other options available to them, and the Court finds that the refusal to accept new Medicaid patients in speech, physical, and occupational therapy for children, and to terminate those patients currently receiving such care, constitutes a threat of irreparable harm.

With respect to other areas of the State, Dr. Robert Hayes of the Wynne Medical Clinic states his clinic is facing possible termination of Medicaid services with the reduction in reimbursement, and that it is considering no new Medicaid patients and no new obstetric cases. Plaintiffs' exhibit 21. Dr. Rhodes of the Family Medical Center of Osceola in Mississippi County, states he and his partner, Dr. Jerry Biggerstaff, are the only physicians in Osceola and the surrounding area that accept Medicaid, and that they accept Medicaid only on children 16 years or younger. He states that with the change in the reimbursement rate, his clinic is no longer financially able to provide this service to the community and that a large number of inhabitants in Mississippi County are in a position of having no medical care available to them. *Id.* Dr. David Rogers of the McBee Rogers Family Medicine clinic in Fayetteville, states that he is one of the few physicians in Fayetteville who accepts new Medicaid patients, of which 50% of his practice depends, and that these Medicaid patients' access to health care will be placed in jeopardy. *Id.* Dr. Paul I. Wills, president of the Sebastian County Medical Society, states that severe access problems for OB/GYN Medicaid patients will develop and that care for these patients is already restricted because of the complex regulations and low reimbursement rates. *Id.* The Court finds that a decline in the availability of these services constitutes a threat of irreparable harm.

**B.**

The Court additionally finds plaintiffs have raised serious questions concerning whether the defendant is violating the federal Medicaid laws with respect to obstetrics and pediatric services, and in speech, physical, and occupational therapy for children. Arkansas' participation in the Medicaid program is optional, but since Arkansas has elected to participate, it must comply with the Act's requirements. *Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989). In that respect, federal Medicaid laws require Arkansas to "assure that payments are consistent with efficiency, economy and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).

As previously noted, two major factors used by the Secretary of Health and Human Services and the courts in determining compliance with the equal access provision are (1) the level of physician participation in the program, and (2) the level of reimbursement to participating physicians. *Clark*, 758 F.Supp. at 576. Plaintiffs have produced substantial evidence showing that the new reimbursement rates are not sufficient to assure full participation by providers in many areas of the State, particularly in Garland and Craighead County. In that respect, the Court rejects as unreasonable the State's definition of participation as being one paid claim by one doctor. The Health Care Finance Administration's draft regulation 6301.1 defines "full participation" as "accepting all Medicaid patients who present themselves for care or treatment." Plaintiffs' exhibit 16. Based on the evidence set forth above, it does not appear that the payments will be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).

Nor does it appear that the level of the new reimbursement rates are adequate. Plaintiffs have produced evidence showing that the effective reimbursement rate is only slightly above 53% of what Blue Cross and Blue Shield's insured patients bring to the physician in terms of reimbursement. This is significant, particularly considering that the providers in this case have testified that their overhead ranges from 58% at the one clinic in Jonesboro to 65% for Doctors Finan and Maris. As many of the providers have so testified, there simply is not a great economic incentive to accept Medicaid patients under the new reimbursement rates, and it does not appear at this time that these rates are sufficient to assure access "to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).[3]

In sum, based on an analysis of the applicable federal law and the evidence produced at the July 20th hearing, the Court finds a greater than 50% chance of probability of success on the claim that the reimbursement rates are inadequate and in violation of the equal access provision. The Court considers significant in this regard that Congress singled out obstetrical and pediatric services as especially important in assuring adequate payment rates when it amended the Medicaid laws. *See* 42 U.S.C. § 1396r–7(a)(1) and (2) (Supp.1992).

## C.

Assessing the balance of harm and the public interest at this point in the proceedings is a difficult proposition. Certainly the Court is cognizant of the severe budget problems facing the Arkansas Department of Human Services and has great sympathy for the defendant in that regard. It must also be recognized, however, that those individuals who are being threatened with the curtailment of services due to the potential under-reimbursement of Medicaid providers face what is possibly grievous harm. Similarly, while it is in the public interest that there be adequate obstetric and pediatric services for those who need them, there was testimony that should the injunction issue, programs such the medically needy program may have to be curtailed. It cannot at this time be said who the balance of harm and the public interest favors, and the Court makes no findings in that regard.

## D.

Having considered the factors in *Dataphase*, the Court finds that the plaintiffs have raised such serious questions concerning access to obstetrical and pediatric care, as well as speech, physical, and occupational therapy for children, that the Court must maintain the status quo with respect to those services until plaintiffs' claims can be adequately investigated and adjudicated. As stated in

---

**3.** The Court shares the concern expressed by the dissent in *Wilder* that "every § 1983 action hereafter brought by providers ... will inevitably seek the substitution of a rate system *preferred by the provider* for the rate system chosen by the State." *Id.* 496 U.S. at 524, 110 S.Ct. at 2525 (Rehnquist, J., dissenting). (Emphasis added.) Nevertheless, the majority opinion in that case is controlling and must be followed by this Court.

another case, "in view of the public interest involved, in medical care to patients, the Court feels that the weight of discretion is on the side of granting the motion [for preliminary injunction]." *Arkansas Society of Pathologists v. Harris,* No. LR–C–80–02 (E.D.Ark. June 4, 1980) (Arnold, J.). The Court's verbal order enjoining the defendant from implementing the 20% reduction in reimbursement rates in obstetrical and pediatric care, and in speech, physical, and occupational therapy for children shall remain in effect pending a trial on the merits.

## IV. *ELEVENTH AMENDMENT*

■ The defendant contends this Court, by ordering that its ruling be made retroactive to July 1, is in violation of the Eleventh Amendment to the United States Constitution.[4] While the Eleventh Amendment bars the award of retroactive relief for violations of federal law that would require the payment of funds from a state treasury, *Edelman v. Jordan, supra,* 415 U.S. at 677, 94 S.Ct. at 1362, the Court may find that a State has waived its constitutional protection under the Eleventh Amendment when "stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Id.* at 673, 94 S.Ct. at 1361 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909).

■ Here, the record leaves no doubt that the State waived its constitutional protection under the Eleventh Amendment. The Court expressly stated in response to questioning from the defendant that its ruling was effective July 20 and would not be made retroactive. However, when the defendant expressed concern over global billing, the Court agreed, for the benefit of the defendant and in response to his concerns, to make its ruling retroactive to July 1. The Court stated:

> I'll tell you what. For administrative ease ... let's just make it retroactive. That is not the inclination but the reason I'm do-

ing it is because of this global billing. I will just make it retroactive because it will be easier for you ... but my inclination when I ruled on the issue of the injunction as of now is not *nunc pro tunc* ...

The Court would not have made its ruling retroactive to July 1 had not the defendant expressed concern over the Court's initial decision to make the ruling effective July 20 and the three-week "window" of lower rates this would create. "A representation made in a judicial proceeding for the purpose of inducing the Court to act or refrain from acting satisfies the requirements stated in *Edelman." Vargas v. Trainor,* 508 F.2d 485, 492 (7th Cir.1974), *cert. denied,* 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). The Court rejects defendant's Eleventh Amendment challenge.

## V. *APPEAL*

■ The defendant seeks permission to appeal the Court's issuance of the preliminary injunction. Although plaintiffs argue such an appeal is premature, the issuance of a preliminary injunction, while not a final judgment, is an appealable order. 28 U.S.C. § 1292(a)(1). *See Kansas Health Care v. Kansas DSRS, supra,* 958 F.2d 1018 (exercising jurisdiction under 28 U.S.C. § 1292(a)(1) of an appeal from an order preliminarily enjoining implementation of a Medicaid reimbursement rate freeze); Wright & A. Miller, *Federal Practice and Procedure* § 2962, at 612. Defendant's petition for permission to appeal is therefore granted.

## VI. *CONCLUSION*

In sum, the defendant's motion for reconsideration is denied. The Court's verbal order enjoining the defendant from implementing the 20% reduction in reimbursement rates in obstetrical and pediatric care, and in speech, physical, and occupational therapy for children shall remain in effect pending a trial on the merits. Should the plaintiffs ultimately prevail in this matter, the Court will not order a permanent injunction provid-

---

4. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

ed the State formulates, in a timely fashion, a plan that is in compliance with federal law.

IT IS SO ORDERED.